August 25, 1995 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 94-1291

RUSSELL VIOLETTE,
Plaintiff - Appellee,

v.

SMITH & NEPHEW DYONICS, INC.,
Defendant - Appellant.



No. 94-1334

RUSSELL VIOLETTE,
Plaintiff - Appellant,

v.

SMITH & NEPHEW DYONICS, INC.,
Defendant - Appellee.



ERRATA SHEET

The opinion of this court issued on August 7, 1995 is
amended as follows:

The coversheet should state that it is an appeal from the
United States District Court for the District of Maine.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 94-1291

RUSSELL VIOLETTE,
Plaintiff - Appellee,

v.

SMITH & NEPHEW DYONICS, INC.,
Defendant - Appellant.



No. 94-1334

RUSSELL VIOLETTE,
Plaintiff - Appellant,

v.

SMITH & NEPHEW DYONICS, INC.,
Defendant - Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Eugene W. Beaulieu, U.S. Magistrate Judge] 



Before

Boudin, Circuit Judge, 
Aldrich, Senior Circuit Judge, 
and Young,* District Judge. 



Joseph J. Leghorn, with whom Peter T. Wechsler, Warner & 
Stackpole, Edward W. Gould and Gross, Minsky, Mogul & Singal, 
P.A., were on brief for appellant Smith & Nephew Dyonics, Inc. 
Daniel J. Popeo and Richard A. Samp on brief for Washington 
Legal Foundation and Allied Educational Foundation, amici curiae.
 

* Of the District of Massachusetts, sitting by designation.

Randall E. Smith, with whom John H. O'Neil, Jr., Smith, 
Elliott, Smith & Garney, P.A., were on brief for appellee Russell 
Violette.
Jeffrey R. White on brief for the Association of Trial 
Lawyers of America, amicus curiae.



August 7, 1995


-2-

YOUNG, District Judge. Russell Violette ("Violette") YOUNG, District Judge. 

instituted this action in the Superior Court in and for Kennebec

County, Maine, seeking to recover for damage to his left wrist

allegedly caused by the improper use of a medical device manu-

factured by the defendant Smith & Nephew Dyonics, Inc.

("Dyonics"), a Massachusetts corporation. Dyonics removed to

federal court, where Violette ultimately obtained a jury verdict

in the amount of $250,000. Dyonics' appeal duly followed. It

must fail.

The relevant prior proceedings and the facts supporting

the jury's verdict, see Data General Corp. v. Grumman Sys. 

Support Corp., 36 F.3d 1147, 1172 (1st Cir. 1994), may be 

sketched briefly. In the summer of 1991, Violette experienced

numbness in his hands and consulted Dr. Robert C.G. Hottentot, an

orthopedic surgeon. Dr. Hottentot's diagnosis was carpal tunnel

syndrome, and Violette underwent a relatively new surgical

"endoscopic" procedure involving the insertion of a slotted metal

tube with a camera lens into the carpal tunnel running from the

patient's wrist to his palm. The surgeon employed the technique

developed and equipment manufactured by Dyonics known as the

ECTRA System (the "product"), which consists of an endoscope and

a set of related devices specifically designed for endoscopic

carpal ligament release. The outcome of the surgery was not as

doctor and patient had hoped -- Violette's ulnar nerve and artery

were severed, resulting in permanent injury to the nerve which

left his small and ring fingers curled up into the shape of a

-3-

claw.

Violette's tort action against Dyonics alleged

negligence (primarily failure to warn), design defect, and breach

of warranty. In its post-removal Answer, Dyonics asserted four

affirmative defenses: 1) the product was designed and

manufactured using techniques representing the state of the art

at the time it was manufactured and sold; 2) any harm to Violette

was caused entirely by the fault of third parties for which

Dyonics cannot be held liable; 3) Dyonics provided adequate

instructions and warnings regarding the appropriate use of the

product; and 4) "Federal regulation of the subject product

preempts the present action."

With the parties' consent, the case proceeded to trial

before a United States Magistrate Judge on the failure to warn

and design defect theories, Violette having waived his breach of

warranty claim. At the close of Violette's evidence, Dyonics

moved for directed verdict, which was denied. A renewed motion

for directed verdict, made at the end of the defense case, and a

motion for judgment notwithstanding the verdict or for new trial,

made after the jury came back in Violette's favor, met with a

similar fate. Other than asserting federal preemption in its

answer, Dyonics never mentioned it again either before or during

the trial. It surfaced as an allegedly viable issue only after

the jury returned its verdict.

A. Preemption A. Preemption

The thrust of Dyonics' appeal is that provisions of the

-4-

Federal Food, Drug and Cosmetic Act of 1938, 21 U.S.C.A. 301

et seq. (West 1972 & Supp. 1993), preempt Violette's state-law 

products liability claims. Specifically, Dyonics points to the

Medical Device Amendments of 1976, 21 U.S.C.A. 351-60 (West

Supp. 1993), as barring the claims made in this case.1 See 

generally Gail H. Javitt, I've Got You Under My Skin -- And I 

Can't Get Redress: An Analysis of Recent Case Law Addressing 

Preemption of Manufacturer Liability for Class III Medical 

Devices, 49 FOOD AND DRUG L.J. 553 (1994). It is simply too 

late, however, for Dyonics to make this argument. Regardless of

its potential applicability, and we express no opinion on the

subject, Dyonics has waived the preemption issue by raising it

substantively for the first time after trial. 

The question of waiver is controlled by a recent

decision of this court, Sweeney v. Westvaco Co., 926 F.2d 29, 36- 

41 (1st Cir.), cert. denied, 502 U.S. 899 (1991). In Sweeney, we 

held that the defendant waived its preemption defense by waiting

to raise it until after the jury had returned an adverse verdict.

Id. at 37. Westvaco's failure to "alert the court to the 
 

1 The amendment states in part: 

[N]o state . . . may establish or
continue in effect with respect to a
device intended for human use any
requirement . . . which is different
from, or in addition to, any requirement
applicable under this chapter to the
device, and . . . which relates to the
safety or effectiveness of the device. .
. .

21 U.S.C. 360k(a) (West Supp. 1993).

-5-

problem" at any one of myriad opportunities prior to the jury

verdict led us to decline to consider the defense.

So here. An issue not presented to the trial court may

not be raised for the first time on appeal. G.D. v. Westmoreland 

School Dist., 930 F.2d 942, 950 (1st Cir. 1991) (plaintiff cannot 

raise on appeal issue not articulated below); Wallace Motor 

Sales, Inc. v. American Motor Sales Corp., 780 F.2d 1049, 1067 

(1st Cir. 1985). Although Dyonics pleaded preemption as an

affirmative defense in its answer, it neither developed a record

on the issue nor pressed it in any fashion before the district

court. Merely mentioning an issue in a pleading is insufficient

to carry a party's burden actually to present a claim or defense

to the district court before arguing the matter on appeal.

Cookish v. Cunningham, 787 F.2d 1, 6 (1st Cir. 1986) (per curiam) 

(allegation in pleadings insufficient to preserve issue on

appeal); Bratt v. International Business Machines Corp., 785 F.2d 

352, 362 n.1 (1st Cir. 1986) (breach of confidentiality claim

mentioned in complaint but never pressed deemed waived); Wallace 

Motor Sales, 780 F.2d at 1067 (1st Cir. 1985) (issue raised in 

pleadings but not at trial was not "presented" to district court

and could not be argued on appeal) (citing In re Linda Coal and 

Supply Co. v. L.H. Haberman and Son, 255 F.2d 653 [3d Cir. 

1958]).

Dyonics had ample opportunity and incentive to assert

preemption below. It chose, however, neither to file a motion to

dismiss nor to press for summary judgment on the issue. In its

-6-

Pretrial Memorandum, under the headings "Facts and Defenses" and

"Controverted Points of Law," Dyonics asserted only that the

endoscopic carpal tunnel surgery was an "accepted practice";

that it warned physicians, including Dr. Hottentot, of the

possibility of injury such as that incurred by Violette; and that

Violette's claim was barred by the "learned intermediary"

defense. There is no mention of preemption. Nor did Dyonics

assert preemption in its trial brief, its numerous motions in

limine, its two motions for directed verdict, and its motion for

judgment n.o.v. or for new trial. See Sweeney, 926 F.2d at 38. 

For whatever reason, it is plain that preemption flickered but

once, dimly, on the radar screen of this litigation and then

disappeared forever, abandoned by Dyonics, depriving the

magistrate judge of his rightful opportunity to address the

question in the first instance. To allow Dyonics to resurrect

the issue here would undermine the logic behind our refusal to

consider issues not presented below: Dyonics "cannot evade the

scrutiny of the district court . . . on appeal with a new claim

in order to create essentially a new trial." Westmoreland School 

District, 930 F.2d at 950. Since this is precisely what Dyonics 

is attempting, and as there are no exceptional or particular

circumstances requiring a detour from the traditional rule, see

id., the applicability of federal preemption is deemed waived and 

we will not examine its applicability to this case.

No doubt recognizing the apparent applicability of

Sweeney v. Westvaco to the facts of this case, Dyonics argues 

-7-

that, in the present circumstances, preemption is a

jurisdictional matter which cannot be waived and may be raised at

any time. It relies primarily on International Longshoremen's 

Ass'n v. Davis, 476 U.S. 380 (1986), where the Supreme Court held 

that Congress had deprived the courts of jurisdiction to decide

cases involving conduct arguably protected by the National Labor

Relations Act, and thus that the plaintiff's state-law fraud

claim was preempted despite the defendant's failure to raise the

issue until after the jury's verdict. See id. at 398; see also 

Sweeney, 926 F.2d at 37-38. In Sweeney, however, we pointed out 

that the Davis principle stemmed from federal statutes involving 

a "choice-of-forum rather than a choice-of-law question."

Sweeney, 926 F.2d at 38 (quoting Davis, 476 U.S. at 391 & n.9). 

That is, where Congress has designated another forum for the

resolution of a certain class of disputes, such as the National

Labor Relations Board in Davis, such designation deprives the 

courts of jurisdiction to decide those cases. See Sweeney, 926 

F.2d at 37. Where, however, the question is whether state tort

or federal statutory law controls, preemption is not

jurisdictional and is subject to the ordinary rules of appellate

adjudication, including timely presentment and waiver. See id. 

at 39. This case presents a "choice-of-law" question and thus

falls squarely within the latter category. Preemption is not

here jurisdictional, and was waived when not presented in the

-8-

district court.2

B. The Jury Verdict B. The Jury Verdict

Violette claimed generally that the ECTRA System was

"in a defective condition unreasonably dangerous," and that

Dyonics failed to warn of the dangers associated with its

 

2 None of Dyonics' proffered authority addresses the question of
waiver of the preemption issue on appeal. See Kennan v. Dow 
Chemical Co., 717 F. Supp. 799 (M.D. Fla. 1989); Fitzgerald v. 
Mallinckrodt, Inc., 681 F. Supp. 404 (E.D. Mich. 1987); Ignace v. 
International Playtex, Inc., No. 86-C-480-C, 1987 WL 93996 (W.D. 
Wis. Aug. 14, 1987). In each of those cases, the defendants were
permitted to raise the preemption issue for the first time in the
context of summary judgment -- an unremarkable result given the
liberal standard for amendments to pleadings of Fed. R. Civ. P.
15(c). As the time for amending pleadings has long passed here,
these cases are inapposite.
Nor is a recent case of ours, Mendes v. Medtronic, 
Inc., 18 F.3d 13 (1st Cir. 1994), of any assistance to Dyonics. 
Affirming a grant of summary judgment to the defendant, we held
there that the Medical Device Amendments, 21 U.S.C. 360k,
preempted plaintiff's common law negligent failure to warn claim
against a pacemaker manufacturer because a factfinder could
impose liability on such a claim "applying standards differing
from or adding to FDA's." Id. at 19. The language of the 
statute and its application in Mendes leave open the possibility 
that a state may impose, establish, or continue burdens identical
to the federal standards, leading ineluctably to the conclusion
that the statute's preemptive effect is not jurisdictional. Had
Dyonics brought its preemption argument before the district court
at the proper time, like the Mendes plaintiff, this Court could 
have reached the merits. The supplemental authorities provided
by Dyonics -- recent cases in which district courts have held
that the Medical Device Amendments preempt state tort claims --
merely serve to highlight the proper procedural context in which
preemption claims ought first be litigated. See Committee of 
Dental Amalgam Alloy Mfrs. v. Henry, 871 F. Supp. 1278, 1285 
(S.D. Cal. 1994) (holding on summary judgment that section 360[k]
preempts California Safe Drinking Water and Toxic Enforcement Act
of 1986); Talbott v. C.R. Bard, Inc., 865 F. Supp. 37, 39-40 (D. 
Mass. 1994) (holding on motion to dismiss that wrongful death and
other state-law causes of action preempted by section 360[k])
(appeal pending); Feldt v. Mentor Corp., No. H-93-2205, slip op. 
at 1-2, 10 (S.D. Tex. July 11, 1994) (holding on summary judgment
that negligence and product liability claims preempted by Medical
Devices Amendments and FDA regulations).

-9-

product. Dyonics asserts that as matter of law its product was

free from defect; that its product was unavoidably unsafe and is

therefore exempt from strict liability; that Dyonics fulfilled

its duty to warn; that Dyonics cannot be liable for a surgeon's

selection of a particular procedure; and that Violette failed to

prove the product proximately caused his injuries. Dyonics also

urges that we reverse because the magistrate judge declined to

give certain jury instructions. These arguments reflect more

hope than experience.

Maine law provides:

One who sells any goods or products in a
defective condition unreasonably
dangerous to the user or consumer or to
his property is subject to liability for
physical harm thereby caused to a person
whom the manufacturer, seller or supplier
might reasonably have expected to use,
consume or be affected by the goods, or
to his property, if the seller is engaged
in the business of selling such a product
and it is expected to and does reach the
user or consumer without significant
change in the condition in which it is
sold. This section applies although the
seller has exercised all possible care in
the preparation and sale of his product
and the user or consumer has not bought
the product from or entered into any
contractual relation with the seller.

ME. REV. STAT. ANN. tit. 14, 221 (West 1980).

Maine applies the danger/utility test to claims of

design defects -- that is, the finder of fact must weigh the

utility of the product against the danger it presents. Guiggey 

v. Bombardier, 615 A.2d 1169, 1172 (Me. 1992); St. Germain v. 

Husqvarna Corp., 544 A.2d 1283, 1285 (Me. 1988); Stanley v. 

-10-

Schiavi Mobile Homes, Inc., 462 A.2d 1144, 1148 (Me. 1983); 

Porter v. Pfizer Hosp. Prod. Group, Inc., 783 F. Supp. 1466, 1474 

(D. Me. 1992) (plaintiff cannot prevail on defective design claim

where he introduced no evidence that the utility of the design

was outweighed by the risks). This process involves an

examination of utility, risk, and the feasibility of safer

alternatives. St. Germain, 544 A.2d at 1285 (quoting Stanley, 

462 A.2d at 1148). The jury's determination that the product was

not safely designed to carry out its intended use was supported

by the evidence, and therefore must stand. 

Dr. Morton Kasdan testified that the product here was

defectively designed because it required only approximations in

the initial placement of the tube on the outside of the skin

without being able to see the ulnar nerve and artery, and that

when inserted below the carpal ligament, the knife cuts through

the ligament before the surgeon can see what is above the

ligament. Dr. Kasdan also testified that the risk involved was

enormous and that the product's use provided no benefit beyond

those available with the safer, proven, alternative technique of

open carpal tunnel surgery. Dyonics' own expert admitted that he

had participated in the development of an alternative

"extrabursal" technique which sought to minimize the risks by

moving the initial placement point and the cutting line further

from the ulnar nerve. Given such testimony, there was sufficient

competent evidence for the jury to believe and conclude that the

ECTRA System was unreasonably dangerous and of little added

-11-

utility compared to available alternatives -- in short,

defectively designed.3

The jury's determination that Dyonics failed to provide

adequate warnings and directions is likewise supported by the

evidence. A manufacturer must provide expected users of its

product with warnings of the risks and "specific directions for

the product's safe use." Pottle v. Up-Right, Inc., 628 A.2d 672, 

675 (Me. 1993). While the Supreme Judicial Court of Maine has

not decided the matter, the general rule regarding medical

devices (and, more frequently and by analogy, prescription drugs)

is that the manufacturer must warn the physician -- the so-called

"learned intermediary" -- and not the patient directly. See 

 

3 Likewise, the evidence of an alternative safe method of
surgery defeats Dyonics' claim that its product is unavoidably
unsafe and therefore exempt from strict liability under comment k
of section 402A of the Restatement (Second) of Torts, which
requires a showing that the utility or benefit of the product
outweighs its risk of danger. See Kearl v. Lederle Lab., 218 
Cal. Rptr. 453, 464 (Ct. App. 1985) (court must consider
availability and safety of alternative products); Belle Bonfils 
Memorial Blood Bank v. Hansen, 665 P.2d 118, 123 (Colo. 1983) (en 
banc) (manufacturer must demonstrate that the "product's benefits
could not be achieved by a substitute product or in another
manner"); Toner v. Lederle Lab., 732 P.2d 297, 306 (Idaho 1987) 
(additional element of comment k's requirement of unavoidable
risk is that there must be "no feasible alternative design which
on balance accomplishes the subject product's purpose with a
lesser risk"); Grundberg v. Upjohn Co., 813 P.2d 89, 93 (Utah 
1991) (same). Even if comment k accurately reflects Maine common
law -- a point we need not decide and express no opinion thereon
-- the refusal of the magistrate judge to find the product
unavoidably unsafe and exempt from strict liability was not clear
error. Salve Regina College v. Russell, 499 U.S. 225, 233 (1990) 
(mixed questions of fact and law are reviewed for clear error;
"deferential review" warranted when district court "better
positioned" to decide the issue); Touch v. Master Unit Die 
Prods., Inc., 43 F.3d 754, 757 (1st Cir. 1995); ICC v. Holmes 
Transp., Inc., 983 F.2d 1122, 1128 (1st Cir. 1993). 

-12-

Knowlton v. Deseret Medical, Inc., 930 F.2d 116, 120 n.2 (1st 

Cir. 1991) (in failure-to-warn suit against catheter

manufacturer, we noted that it "is generally accepted that in a

case involving medical products prescribed or used by a physician

or trained medical personnel, the warning runs to the physician

not the patient"); Phelps v. Sherwood Medical Indus., 836 F.2d 

296, 299, 302 (7th Cir. 1987) (heart catheter manufacturer has

duty to warn physicians); Brooks v. Medtronic, Inc., 750 F.2d 

1227, 1232 (4th Cir. 1984) (pacemaker manufacturer has duty to

warn physician, not patient); Desmarais v. Dow Corning Corp., 712 

F. Supp. 13, 17 & n.5 (D. Conn. 1989) (manufacturer of breast

implants has duty to warn physician); cf. Garside v. Osco Drug, 

Inc., 976 F.2d 77, 80 (1st Cir. 1992) (where product is a 

prescription drug, duty to warn runs to physician). Dr. Chow,

Dyonics' ECTRA System instructor, admitted that in May of 1991,

when the equipment was purchased by Dr. Hottentot's practice, the

extrabursal technique was being taught at seminars put on by the

ECTRA faculty. Both Dr. Chow and Jan Cook, the associate product

manager for Dyonics, admitted that the extrabursal technique was

safer and easier to learn and to teach. Dr. Hottentot was not

provided with any materials referring to this safer technique or

given adequate warnings of the real potential for complications.

On this record, we conclude that the jury had sufficient basis to

find Dyonics in breach of its duty to warn.

Dyonics argues that a failure to warn claim will not

lie under Maine law where the risk of danger associated with the

-13-

use of the product was obvious to the user, citing Lorfano v. 

Dura Stone Steps, Inc., 569 A.2d 195, 197 (Me. 1990) ("dangers 

posed by the use of steps without a handrail are patently obvious

and equally apparent to all"). A high-technology, precision

medical device is, needless to say, a far cry from a handrail.

Moreover, while a physician cannot be held liable for an adverse

outcome simply because the result could have been avoided by a

different selection as between two reasonable procedures, Roberts 

v. Tardif, 417 A.2d 444, 448 (Me. 1980), here there was 

sufficient evidence that use of the ECTRA System was

unreasonably dangerous without further warnings or proper

instructional materials. A jury could conclude that Dr.

Hottentot's uninformed choice of the product was not a reasonable

selection of an alternative surgical procedure, thus insulating

Dyonics from liability. Any extension of Roberts to protect a 

manufacturer in Dyonics' position is unwarranted.

A jury verdict may be set aside "only if [it] is so

seriously mistaken, so clearly against the law or the evidence,

as to constitute a miscarriage of justice." Levesque v. Anchor 

Motor Freight,Inc., 832 F.2d 702, 703 (1st Cir. 1987). Such is 

not the case here.

Finally, the magistrate judge committed no error by

refusing to give two proposed jury instructions. Dyonics sought

an instruction, based on Roberts, supra, that a manufacturer of a 

medical device cannot be held liable merely because the surgeon

could have pursued an alternate course of treatment and thereby

-14-

avoided the injury. As noted above, such an extension of Roberts 

is unwarranted in this case. Dyonics also sought the following

instruction, citing May v. Dafoe, 611 P.2d 1275, 1278 (Wash. App. 

1980):

A manufacturer of medical products is not
responsible for the education and
training of doctors who may use its
product. The responsibility for
determining whether an individual doctor
is sufficiently skilled and trained to
use a particular product lies with the
doctor himself or herself and the
facilities where they practice.

Such instruction was unnecessary in this failure to warn-design

defect case and, in any event, the refusal to give this

instruction caused no prejudice to Dyonics since Dr. Hottentot

followed the product instructions he had been given. See Davet 

v. Maccarone, 973 F.2d 22, 26 (1st Cir. 1992) ("An error in jury 

instructions will warrant reversal of a judgment only if the

error is determined to have been prejudicial, based on a review

of the record as a whole").

For these reasons, the Amended Judgment entered in this

action on March 17, 1994, pursuant to the jury's verdict, is

affirmed.4 

 

4 Violette also cross-appealed, requesting reversal of numerous
rulings of the magistrate judge in the event we had determined
that Dyonics was entitled to a new trial. As Dyonics is not so
entitled, there is no need to address the issues raised by the
cross-appeal, and it is dismissed as moot.

-15-